NOT FOR PUBLICATION                                          (Doc. No. 23)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

<table>
<tr><td>——————————————————</td><td>:</td><td></td></tr>
<tr><td>NICOLE A. GRIFFITH,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Plaintiff,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>Civil No. 13-5407 (RBK/KMW)</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>PNC BANK, ASHESH SHAH, and</td><td>:</td><td>**OPINION**</td></tr>
<tr><td>JOHN DOE DECISIONMAKERS (1-10),</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Defendants.</td><td>:</td><td></td></tr>
<tr><td>——————————————————</td><td>:</td><td></td></tr>
</table>

**KUGLER**, United States District Judge:

This matter comes before the Court on the Motion of Defendants PNC Bank National Association ("PNC") and Ashesh Shah ("Shah") (collectively "Defendants") for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. No. 23). The subject of this motion is Plaintiff Nicole A. Griffith's ("Plaintiff" or "Griffith") Complaint, in which she alleges Defendants unlawfully interfered with the exercise of her rights under the Family Medical Leave Act ("FMLA"), and its New Jersey counterpart, and retaliated against her for exercising those rights. For the reasons stated herein, Defendants' Motion for Summary Judgment will be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Relevant Facts[1]

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

On August 8, 2011, PNC terminated Griffith's employment at its Absecon, New Jersey

branch office.  (Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 46.)[2]  Based on

Peggy Atkinson's ("Atkinson")[3] investigation into the events of June 22, 2011, it was decided

that Plaintiff's employment should be terminated.  (Id. ¶ 44.)[4]  Defendants claim Plaintiff was

terminated consistent with PNC's zero-tolerance policy for "force balancing," (Defs.' Br. at 10),

while Griffith claims she was terminated because of her prior requests for family medical leave,

and time spent on that leave in the months leading up to her termination.  (Pl.'s Opp'n at 8-12.)

Plaintiff was employed with PNC as a teller from 1996 until 2000, and she was rehired

by PNC as a teller on February 13, 2006.  (Id. ¶ 1.)  PNC promoted Griffith to Teller Supervisor

in 2009, the position she remained in until her termination in 2011.  (Id. ¶ 2; Pl.'s SMF ¶ 1.)  As

Teller Supervisor Plaintiff performed both the role of a teller (servicing customers, processing

deposits and withdrawals, and handling cash), as well as a leadership function in the branch,

which included training tellers, answering questions regarding bank policies and procedures, and

---

[2] To the extent the parties agree on particular facts, the Court will cite Defendants' Statement of Undisputed Material Facts and Plaintiff's Counter Statement of Undisputed Material Facts ("Pl.'s SMF") in support of those facts.  Otherwise, the Court will rely on the record for disputed facts.

However, the Court notes that both parties failed to attach the exhibits included with the opposition papers (Plaintiff) and reply papers (Defendants) to an affidavit or other declaration.  Accordingly, the Court will disregard those exhibits for purposes of deciding this motion, as they are not a part of the record.  See Countryside Oil Co., Inc. v. Travelers Ins. Co, 928 F. Supp. 474, 482 (D.N.J. 1995) (explaining that, on a motion for summary judgment, discovery materials must be attached as exhibits to an affidavit and the Court may not accept or rely on an item of discovery that is not made an exhibit to an affidavit).  Instead, the Court will only consider the exhibits attached to the declarations of Peggy Atkinson and Stephanie Underwood, included with Defendants' original motion papers, as well as any facts that are admitted by both parties in their statements of undisputed material facts and responsive statements.

[3] Atkinson was the Senior Employee Relations Investigator at PNC during all relevant times.  (Atkinson Decl. ¶ 2.)

[4] Though Plaintiff denies this fact in her Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp."), (id. ¶ 44 (citing Ex. B to Underwood Decl., Deposition Testimony of Ashesh Shah ("Shah Dep.") at 193:1-195:20)), the portion of deposition testimony she cites in support of her position is found nowhere in the record. (See generally id. (only containing pages 1-90 of Shah's deposition testimony; see also Ex. A to Underwood Decl., Deposition Testimony of Nicole Griffith ("Griffith Dep.") (containing pages 193-94, but not 195 of Griffith's deposition testimony, and not supporting Plaintiff's contention put forth in her Responsive Statement).)  Accordingly, the Court considers this fact admitted for purposes of this Motion.

helping tellers with their cash handling.  (Griffith Dep. at 20:23-21:13, 70:13-19, 80:16-81:24.)
Griffith was provided extensive training with PNC policies and procedures, and as Teller
Supervisor she was responsible for ensuring that the branch complied with PNC's policies and
procedures.  (Defs.' SMF ¶ 4.)  In her role as Teller Supervisor, Plaintiff reported to the Branch
Manager Shah.  (Id. ¶ 2.)  When Shah prepared an evaluation for Griffith's first year as a Teller
Supervisor in 2009, he gave her an overall rating of "Achieves."

PNC's Loss Prevention Department tracks teller differences on a rolling twelve-month
period; teller differences are used in the evaluation of a teller's performance and, if certain levels
of differences and occurrences are reached, performance counseling is imposed.  (Id. ¶ 8.)  Teller
differences over $1,000 result in automatic probation and possible termination.  (Id.)  In
December 2010, Shah issued Griffith a written warning for teller differences of $918.11, after
consultation with PNC's Employee Relations Department.  (Id. ¶ 9.)  Griffith acknowledges that
it was an important part of her job to avoid teller differences, and that the written warning she
received in December 2010 from Shah was warranted under PNC's policies.  (Id. ¶ 10.)

Then, in January 2011, Shah issued Griffith another written warning for a policy
violation involving security procedures.  (Id. ¶ 11.)  Specifically, Griffith failed to follow proper
security procedures when she left $33,000 unsecured in her teller drawer at the end of her shift.
(Id.)  Griffith was later placed on probation for teller differences on February 28, 2011, for
having over $1,300.00 in differences in 41 occurrences.  (Id. ¶ 13.)  Her probationary notice
provided that she must not have any teller differences during the probationary period, which
ended June 30, 2011, and that her employment may be terminated if she did not show immediate
and sustained improvement during the probationary period.  (Id. ¶ 14.)

Though the importance and implications of the events of June 22, 2011, are contested, the events themselves are not in dispute. On that day, shortly after lunch time, Griffith was asked by one of the tellers to do a buy/sell transaction. (Id. ¶ 25.)[5] As part of this transaction, Griffith took $5000 from the bank's vault and gave it to the teller, but failed to record the transaction at the time of the transfer, as PNC required. (Id. ¶ 26.)[6] Because both Griffith and the teller were busy assisting customers, they did not properly record the buy/sell transaction at the time. (Griffith Dep. at 35:14-24, 183:1-10.)

Griffith also had a doctor's appointment that day, which required her to leave work early. (Defs.' SMF ¶ 27.) Before going to the appointment, however, she was required to count and balance both her drawn and the vault. (Id.) Though she counted her drawer before leaving, (id. ¶ 28), Plaintiff claims she forgot about the buy/sell transaction and instead relied on a count of the vault she had done a couple hours earlier. (Griffith Dep. at 44:25-45:21, 47:22-24, 52:4-22, 180:8-24.) This was apparently due in part to the line of customers that had formed as she was exchanging the $5,000 with the teller, which prompted Plaintiff to re-open her window and her drawer to help the customers. (Pl.'s SMF ¶¶ 38-39.) Had Griffith recounted the vault after the buy/sell transaction, she would have been $5,000 short due to her failure to process the buy/sell

---

[5] The exchange of cash between tellers at PNC is referred to as a "buy/sell" transaction. (Defs.' SMF ¶ 21.) As Teller Supervisor, Griffith would frequently have to "sell" cash from the vault to other tellers in the branch who needed it for transactions. (Id.) The transaction involved the seller bringing money from the vault to the buyer, the buyer bringing a ticket, which recorded the transaction, to the seller, and the seller processing the ticket at the time of the transaction. (See Griffith Dep. at 29:3-32:20.) Though Plaintiff claims a buy/sell ticket for the transaction could be completed later if the tellers were busy with customers at the time, (Griffith Dep. at 29:19-30:7), PNC's own policies indicate that the buy/sell transaction was to be processed at the time of the cash transfer. (Ex. 21 to Griffith Dep., Buying or Selling Cash Policy ("Buy/Sell Policy").)

[6] Plaintiff apparently contests at least part of this fact, but cites nothing in support of her position. Accordingly, the Court considers this fact undisputed for purposes of the present Motion. (See also Defs.' SMF ¶¶ 8, 9, 30, 48, 61, 62, 72, 74 (denying Defendants' facts but failing to cite any materials on the record in support of her denial).)

transaction.  (Defs.' SMF ¶ 30.)[7]  Plaintiff testified, however, that had she not left early for a doctor's appointment, she would have realized the $5,000 difference, processed the buy/sell ticket, and eliminated any errors before closing.  (Griffith Dep. at 46:4-12.)  Yet, when Griffith left for the day on June 22, 2011, she showed both her teller drawer and vault as balanced, despite having not accounted for the $5,000 taken from the vault.  (Griffith Dep. at 45:22-46:6, 189:18-190:3.)

After Griffith left for the day, the teller who was the "buyer" in the buy/sell transaction alerted Assistant Branch Manager Eileen Risler ("Risler") that she was $5,000 over.  (Defs.' SMF ¶ 33.)  Risler contacted Griffith, who returned to the Absecon Branch around 4 p.m. on June 22, 2011.  (Id. ¶ 34.)  When Griffith had returned, and in her presence, Risler conducted an audit which revealed that Griffith had showed a "zero balance" in her cash balancing when, in fact, her vault was $5,000 short.  (Id.)  Plaintiff does not dispute the results of this audit.  (Id. ¶ 35.)  After being notified by Risler of the results of the audit, Shah contacted PNC's Employee Relations Information Center ("ERIC") on June 23, 2011, due to the possibility that Griffith had violated PNC policy by engaging in force balancing.  (Id. ¶ 36.)

PNC had a written policy against force balancing—the act of "manipulating a teller's cash figures to force the cashbox into balance."  (Ex. A to Atkinson Decl., Force Balancing Policy ("Policy").)  PNC had zero-tolerance for force balancing, and considered it a terminable offense.  (Id.; see also Griffith Dep. at 25:1-21; 43:13-17.)  Moreover, this penalty was without

---

[7] There is some disagreement as to whether Griffith would have been able to correct the failure to immediately record the buy/sell transaction at the time it occurred by recording it prior to the end of her shift.  Defendants allege that Plaintiff would have been forced to accept the discrepancy, (Defs.' SMF ¶¶ 23, 31; Griffith Dep. at 40:10-22, 50:7-14), while Plaintiff claims she could have cured the deficiency and recorded the buy/sell transaction prior to conducting her final count of her teller drawer and the vault.  (Pl.'s Resp. ¶ 23, 31; Griffith Dep. at 29:19-30:7, 31:5-19, 46:7-12.)  Though Defendants seemingly belabor the point because Plaintiff also faced serious consequences, including possible termination, if she reported another teller difference, (Defs.' SMF ¶ 14; Griffith Dep. at 105:21-106:14), the Court considers this issue disputed for purposes of this Motion.

regard to the employee's intentions, who may have purposefully or accidentally engaged in force balancing.  (Atkinson Decl. ¶ 6.)   The reason for this seemingly harsh rule was that PNC's employees were required to abide by its fidelity bond in order to be covered by its Bonding Policy, and any act of dishonesty, which included "false proofing/force balancing," could result in suspension from bond coverage and termination of employment.  (Defs.' SMF ¶¶ 17-18.) Plaintiff was aware of PNC's policies and procedures; she had received training on PNC's Code of Ethics; she knew how important it was for her to follow the policies and procedures; and she knew the consequences of failing to adhere to PNC's force balancing policy, including termination.  (Id. ¶ 20.)

Due to the indication that Griffith had engaged in force balancing, PNC conducted an investigation into the incident.  Beginning on July 7, 2011, Atkinson began by calling Shah, who had first contacted ERIC about the suspected force balancing, and left him a message.  (Ex. D to Atkinson Decl., Investigation Report ("Report").)  Because she was on vacation for the following few days, Atkinson contacted Shah again on July 12, 2011, and conducted an interview at that time.  (Id.; Atkinson Decl. ¶¶ 10-11.)  Though she attempted to contact Griffith on July 13, 2011, Atkinson learned Plaintiff was on medical leave and was unable to speak with her until August 8, 2011.  (Id. ¶¶ 12-14; Report.)  As a matter of policy, PNC does not interview employees as part of its internal investigations while an employee is on medical leave, including FMLA leave. (Defs.' SMF ¶ 75.)

Griffith returned from medical leave on August 8, at which point Atkinson called and interviewed her about the incident on June 22.  (Id. ¶ 38.)  Plaintiff was called into Shah's office where she met with Regional Manager Joseph Bednarik ("Bednarik") and Atkinson, who was on the phone.  (Id. ¶ 39; Pl.'s SMF ¶ 46.)  During Atkinson's phone interview, Plaintiff admitted

that on June 22, 2011, she did not recount the vault before leaving for the day, despite having conducted a buy/sell transaction after she had last counted the vault.  (Griffith Dep. 193:15-194:25; Report; Atkinson Decl. ¶ 15.)  After the phone call and Atkinson's investigation had concluded, Atkinson determined that Griffith had violated the Code of Ethics by engaging in force balancing in violation of PNC policy, and that Griffith was no longer employable with PNC because she was no longer bondable under PNC's fidelity Bonding Policy.  (Report; Atkinson Decl. ¶ 16.)  Based on her investigation, Atkinson recommended to Shah and Bednarik that Griffith's employment be terminated for violating PNC's policy prohibiting force balancing, and both managers agreed with her recommendation.  (Id. ¶ 17.)  On August 8, 2011, PNC terminated Griffith's employment.  (Defs.' SMF ¶ 46.)[8]

Plaintiff is unaware of any employees who engaged in force balancing but were not terminated by PNC.  (Id. ¶ 47.)[9]  In fact, between August 2010 and August 2012, PNC terminated thirty-two employees, including Griffith, for force balancing in the Philadelphia – Southern New Jersey region.  (Id. ¶ 48.)

---

[8] Plaintiff argues that the decision to terminate her employment was made prior to the telephone interview with Atkinson, as that decision was allegedly communicated to her during the telephone conversation.  (See Pl.'s Resp. ¶¶ 42-45 (citing Griffith Dep. at 193:1-195:20).)  Despite her attempt to challenge the timing of PNC's decision, the records cited by Plaintiff do not actually support her position, and the Court will not credit her version of the facts for purposes of deciding this Motion.

[9] Griffith did testify at her deposition that Risler had a $15,000 difference on one occasion and apparently suffered no adverse consequences.  (Griffith Dep. at 200:4-201:22.)  According to Griffith's testimony, however, Risler showed the difference rather than a zero-balance, so she had not actually engaged in force balancing.  (Id.)

Griffith also notes that PNC's Bonding Policy considers "notarizing a document when the person does not sign the document in front of you," a dishonest act that may suspend bond coverage and result in termination of employment.  (Pl.'s SMF ¶ 50.)  In one case, Shah, a notary public, requested that another employee notarize a document for his wife outside her presence.  (Pl.'s SMF ¶ 50; Defs.' Resp. ¶ 50.)  Despite this act, Shah was never disciplined.  (Pl.'s SMF ¶ 51; Defs.' Resp. ¶ 51.)  Additionally, that employee internally complained to ERIC about retaliation.  (Pl.'s SMF ¶ 50; Defs.'s Resp. ¶ 50.)

Despite this series of events, Plaintiff asserts that the force balancing justification for her termination was merely pretext, and PNC was actually interfering with her rights under the FMLA up and until the day when it terminated her employment.

During Griffith's employment, PNC approved all of the FMLA leave that Griffith applied for and was eligible to receive.  (Defs.' SMF ¶ 49.)  Because Plaintiff's son has a chronic heart condition that requires frequent medical appointments and care, she applied for intermittent FMLA leave to care for her son's condition shortly after her transfer to the Absecon Branch.  (Id. ¶¶ 50-51.)  PNC approved Plaintiff's request for leave for the period from March 1, 2010 to March 16, 2011.  (Id. ¶ 51.)  On March 17, 2011, PNC approved Griffith's request to extend her intermittent FMLA leave to care for her son from March 16, 2011, to February 12, 2012.  (Id. ¶ 52.)  During this period, PNC approved Griffith's request to be allowed to take intermittent FMLA leave six times per month, at three to four hours per absence, based on the recommendation of her son's doctor.  (Id. ¶ 53.)

On July 13, 2011, Griffith was admitted to the hospital for chest pains, where she received a cardiac catheterization on July 15, 2011.  (Id. ¶ 55.)  PNC then approved Griffith's request for short term disability and FMLA leave, which ran concurrently, for the period of July 12, 2011, through August 7, 2011.  (Id. ¶ 56.)  On August 8, 2011, Griffith returned to work after her FMLA leave.  (Id. ¶ 57.)

Despite having her FMLA leave requests all granted, Plaintiff alleges that Defendants interfered with her rights to take that leave.  (Id. ¶ 58.)  For instance, Plaintiff claims Shah harassed her for taking FMLA leave.  (Id. ¶ 59.)[10]  Griffith testified that on one occasion, Shah

---

[10] Plaintiff also claims Shah gave her a hard time about taking time off before she applied for intermittent FMLA leave.  (Pl.'s SMF ¶ 9 (citing Griffith Dep. at 116:10-24); id. ¶ 14 (citing Griffith Dep. at 136:7-137:5).)  While one of the pages of Griffith's Deposition cited by Plaintiff is not included in the record, Defendants admit that Plaintiff

informed another employee that he could not give her time off of work because Griffith had to take her son to the hospital.  (Id. ¶ 60.)  On another occasion Shah offered to allow Griffith to work on Saturdays and Sundays as a schedule accommodation so that she could make certain personal phone calls during the week.  (Id. ¶ 61.)  Griffith believes Shah was actually attempting to force her to work weekends to make up for her FMLA hours, though she testified that he was "offering [her] to work Saturday and Sunday to make up the hours that [she was] missing during the week."  (Griffith Dep. at 124:1-17.)  This came after Shah had received complaints from employees in the Absecon Branch that Griffith was making phone calls to her son's doctors during business hours.  (Defs.' SMF ¶ 61.)

Additionally, Shah asked PNC's Employee Relations Department whether Griffith could use paid time off instead of FMLA leave, or use vacation time rather than FMLA, because of the financial burden of FMLA leave being unpaid.  (Id. ¶ 62.)  Shah also called the ERIC hotline on three occasions as well to ask questions regarding Plaintiff's use of FMLA leave.  On September 21, 2010, and January 27, 2011, Shah contacted ERIC to ask whether he could advise Griffith to use her vacation time instead of FMLA leave, (Pl.'s SMF ¶¶ 28-29; Defs.' Resp. ¶¶ 28-29),[11] as she had previously complained to him about the financial burden of taking unpaid FMLA leave. (Defs.' SMF ¶ 62; Shah Dep. at 47:13-48:22.)  Finally, Shah called ERIC on April 24, 2011, to report that he had seen Griffith driving her car when she was on medical leave, saying it "[did] not sit well with him," and he was told that "FMLA is not like house arrest for Nicole."  (Pl.'s SMF ¶ 30; Defs.' Resp. ¶ 30.)

---

testified that Shah allegedly made comments prior to her applying for FMLA leave.  (Defs.' Resp. to Pl.'s SMF ("Defs.' Resp.") ¶ 9.)

[11] In support of paragraphs 28-30 of her Counter Statement of Undisputed Material Facts, Plaintiff cites Exhibits D-F attached with her opposition papers.  However, Plaintiff did not attach those exhibits to an affidavit or any other certification that was submitted with her opposition papers.  Accordingly, the Court disregards those exhibits for purposes of deciding this motion.  See supra note 2.

According to Plaintiff, Risler also used to assist Griffith with counting large quantities of money brought in when business customers, such as gas stations, came in to have their cash counted.  (Pl.'s SMF ¶ 15.)  However, when Plaintiff returned from medical leave in March 2011, Risler allegedly told her that Shah had instructed Risler to stop coming behind the teller counter to assist Plaintiff with these large cash counting transactions.  (Id.)  Similarly, Risler was instructed by Shah to no longer help any of the tellers on the teller line, including Griffith, at or around this time.  (Pl.'s SMF ¶ 16.)  Plaintiff also claims that Risler made comments about Plaintiff's need to leave work, about her son being sick, and about her need to leave to care for her son.  (Pl.'s SMF ¶ 17.)  Further, Griffith testified that on one occasion Risler yelled across the office, "Nicole, the school's on the phone.  I guess she'll be leaving again for the day."  (Id. ¶ 12.)

In early 2011, Shah gave Griffith her 2010 performance appraisal that contained the following language under "Employee Satisfaction – self & team members":

> Marginally achieves: Nicole has not been able to communicate with her team members about ongoing usage of her personal time during work weeks (to take care of family members in medical needs).  [M]any of her team members have reported to manager about this.  Most of them are not happy.  To accommodate Nicole's family medical needs, Nicole was also offered either to work every Saturday so that she can get 4 hours off during work week or late start on Thursday or Friday.  She chose not to take either option.

(Defs.' SMF ¶ 63; Ex. 19 to Griffith Dep., 2010 Performance Appraisal ("2010 Appraisal").)  Her overall performance rating was "marginally achieves."  (Id.)  Plaintiff took issue with this section of her performance appraisal, as she believed that it was improper to have anything in the appraisal about her family, and internally complained to ERIC about this fact.  (Defs.' SMF ¶ 64.)  Eleven days after Griffith contacted ERIC regarding the appraisal language, Shah, with

guidance from the Employee Relations Department, revised the language and reissued the appraisal to Plaintiff.  (Id. ¶ 65.)  Despite the revision, her overall performance rating was still "marginally achieves."  (Ex. 20 to Griffith Dep., 2010 Revised Performance Appraisal ("Revised Appraisal").)  Plaintiff complained to Bednarik that she did not think it was fair that she was not recommended for a raise based on these ratings, particularly where she had more "achieves" on her appraisal than "marginally achieves."  (Id.)

Griffith testified that she also contacted Bednarik's secretary, Stephanie Morrissey ("Morrissey"), to complain that Shah had told another employee to not to speak with Griffith any more.  (Pl.'s SMF ¶ 18; Defs.' Resp. ¶ 18.)[12]  Morrissey testified that whenever an employee complained to her she would refer to matter to Bednarik.  (Pl.'s SMF ¶ 21; Defs.' Resp. ¶ 21.)

Despite all of these allegations, Shah testified that he had no issues with Griffith's FMLA leave.  (Shah Dep. at 37:22-24, 42:25-43:3.)

### B.     Procedural History

Plaintiff filed this action against Defendants[13] in the Superior Court of New Jersey, Atlantic County, on August 7, 2013.  (Notice of Removal (Doc. No. 1).)  Defendants were served with the Complaint and Summons between August 21 and August 23, 2013, and filed their

---

[12] Here Plaintiff sites portions of Griffith's testimony attached only to her own opposition papers for further facts relating to Morrissey, and Defendants deny several of those facts.  For the reasons stated supra in note 2, the Court does not consider this testimony to be part of the record, and will disregard these purported facts for purposes of this Motion.

[13] Plaintiff also named in her Complaint John Doe Decisionmakers (Plural 1-10).  "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities."  Cordial v. Atlantic City, Civ. No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 Fed. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court."  Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiff has failed to amend her Complaint or otherwise identify any of the fictitious John Doe Decisionmakers, despite the fact that discovery has now closed.  Thus, these parties shall be dismissed.

timely Notice of Removal pursuant to 28 U.S.C. § 1446(b) on September 11, 2013. (Id.)  In their notice of removal, Defendants rely on this Court's original federal question jurisdiction under 28 U.S.C. § 1331.

In her Complaint, Plaintiff alleges that all Defendants violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq., as well as the New Jersey Family Leave Act, N.J. Stat. §§ 34:11B-1 et seq. (the "NJFLA").  Based on the claims in Plaintiff's Complaint, the Court finds that it has jurisdiction under § 1331 to hear this matter.

On October 1, 2014, Defendants filed the present Motion for Summary Judgment. Because the issues have been fully briefed by the parties, the Court will proceed to their arguments.

## II.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact.  Anderson, 477 U.S. at 248.  Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor.  Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment.  Anderson, 477 U.S. at 256.  The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor.  Id. at 257.  The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.  DISCUSSION

Plaintiff brings both retaliation and interference FMLA and NJFLA claims against PNC and Shah.[14]  The Court will discuss the merits of each of these claims in turn.

### A.  FMLA Retaliation Claim

When FMLA retaliation claims are based on circumstantial evidence, they are analyzed under the McDonnell Douglas burden-shifting framework.  See Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).[15]  Under this framework, Plaintiff must first establish a prima facie case of discrimination under the FMLA—that (1) she exercised her right to FMLA-qualifying leave, (2) she suffered an adverse employment action, and (3) the adverse action was causally related to her invocation of rights.

---

[14] Due to the similarity of the statutes, courts in this district apply the same standards and framework to retaliation and interference claims under the FMLA and NJFLA.  See Santossusso v. NovaCare Rehabilitation, 462 F. Supp. 2d 590, 596 n.4 (D.N.J. 2006).  For ease of reference, the Court will use "FMLA" throughout the remainder of this discussion.

[15] When FMLA retaliation claims are based on "direct evidence," they are assessed under the mixed-motive framework set forth in Price Waterhouse.  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 961 F.3d 294, 302 (3d Cir. 2012) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989)).  Plaintiff has presented no such direct evidence in this case, nor has she argued that this case should be decided under the Price Waterhouse mixed-motive framework.

Id.  If Plaintiff successfully establishes a prima facie case, Defendants must articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.  Then, the burden shifts back to Plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a pretext for retaliation.  Id.  For purposes of the present Motion, Defendants concede that Plaintiff has established a prima facie case of discrimination.

### 1.      Defendants' Legitimate, Non-Discriminatory Reason

Defendants have articulated a legitimate, non-discriminatory reason for their decision to terminate Griffith's employment.  The parties do not dispute that on June 22, 2011, Plaintiff showed her cash figures as balanced when, in fact, she was $5,000 short.  PNC considered this conduct—showing cash figures as balanced when they were not—to be force balancing.  Force balancing, whether intentional or not, was an act of dishonesty under PNC's Code of Ethics and Bonding Policy, and was grounds for termination.  The Court finds that Defendants' showing satisfies their requirement under the McDonnell Douglas burden-shifting framework, and the burden shifts back to Plaintiff to show that Defendants' proffered reason for her termination was pretextual.

### 2.      Plaintiff's Evidence of Pretext

To establish pretext, Plaintiff must show more than that Defendants' reason for her termination was wrong or mistaken.  Fuentes, 32 F.3d at 765.  Instead, she is required to prove that Defendants' articulated non-retaliatory reason is either: (1) a post hoc fabrication designed to camouflage intentional retaliation or (2) not the motivation behind Defendants' decisions.  Id. at 764.  To do this, Griffith must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and

hence infer "that [Defendants] did not act for the asserted non-discriminatory reasons.'" Id. at

765 (internal citations omitted) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d

509, 533 (3d Cir. 1992); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.

1993)).

     Here, Plaintiff argues that Defendants' proffered reason for her termination was

pretextual based on the fact that: (1) the temporal proximity between her protected activity and

her termination was unduly suggestive; (2) she should not have been discharged because she

made an "honest error" and did not intend to force balance; (3) the alleged comments made by

Shah about her leave could lead a reasonable jury to conclude that the reason for her termination

is not worthy of credence; and (4) Shah was not terminated for allegedly violating a policy

related to notarizing documents.  (See Pl.'s Opp'n at 8-12.)  The Court finds that Plaintiff's

arguments, taken individually or as a whole, are insufficient to establish pretext.

### a.     Temporal Proximity

     Plaintiff spends the most effort in her opposition arguing that the timing of her

termination is evidence of Defendants' pretext.  (Pl.'s Opp'n at 8-10, 12.)  Relying principally on

Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294 (3d Cir. 2012), Plaintiff contends

that Defendants' act of terminating her the day she returned from FMLA leave on August 8,

2011, is "unduly suggestive" of Defendants' true, improper motive.  (Pl.'s Opp'n at 9-10.)

     This Court finds Plaintiff's reliance on Lichtenstein inapposite for the case at hand.  In

Lichentstein the Third Circuit confronted a situation where an employee was terminated for

excessive absenteeism and tardiness, but was not told of her termination until after returning

from a period of FMLA leave.  The timing of the plaintiff's termination—whether the decision

was made prior to her request for FMLA leave—was highly relevant because there was an open

question as to whether the plaintiff's supervisor relied on, or was even aware of, the "last straw" incident of absenteeism when making the decision to terminate the Plaintiff, and whether the decision was made prior to or after the plaintiff took her FMLA leave.  691 F.3d at 310-12. Because the record was disputed as to both the motivation and the timing of the defendant's decision to fire the plaintiff, particularly where most of the plaintiff's deficiencies were well known prior to her taking FMLA leave and the decision to terminate her prior to taking leave would have been justified, the Third Circuit vacated the district court's grant of summary judgment.  Id. at 311-12.

Rather than arguing that they made their decision to terminate Plaintiff prior to her FMLA leave but were made to wait to tell her until she returned, as was the case in Lichentstein, Defendants in this case claim they made their decision only after Atkinson was allowed to interview Plaintiff on August 8, 2011, and the record supports their position.

First, there is no actual dispute that the decision to terminate Plaintiff's employment was made after Atkinson conducted a phone interview with Plaintiff on August 8, 2011.  Plaintiff also does not dispute that Shah immediately contacted ERIC on June 23, 2011, about Griffith's possible force balancing incident on the previous day, or that Atkinson did not begin her investigation of Griffith's conduct until July 7, 2011.  It is undisputed that Atkinson was unable to contact Shah, due to her own vacation arrangements, until July 12, 2011, and when she attempted to contact Griffith on July 13, 2011, she was told that Plaintiff was on leave until August 8, 2011.  Because PNC had a policy prohibiting Atkinson from interviewing Griffith while she was on FMLA leave, Atkinson was forced to wait until August 8 to interview her. Once this interview had occurred, and Griffith admitted to the conduct that PNC considered to be force balancing, Atkinson made her recommendation to Shah and Bednarik that Griffith be

16

terminated for force balancing.  At that point, the decision was apparently made to terminate Griffith's employment.

Plaintiff offer no evidence to call this order of events into question.  Nor has Plaintiff pointed to any evidence suggesting that Defendants knew they would be justified in terminating Plaintiff's employment prior to Atkinson's interview with Plaintiff on August 8, 2011.  In fact, the record does not reflect whether Defendants had cause to terminate Plaintiff's employment until the force balancing incident had occurred and been fully investigated.

Viewed in the larger context, the timing is even less suspect.  Plaintiff had requested and been granted FMLA leave intermittently for at over one year prior to her termination, and there is no indication that Plaintiff ever had trouble obtaining the leave she needed.  Why waiting until after Plaintiff had taken leave intermittently for almost a year and then consistently for almost a month should be considered unusually suspect is unclear to the Court.  Plaintiff's termination may have occurred on the day she returned to work from her own personal FMLA leave, but she had been taking intermittent FMLA leave for quite some time and never suffered an adverse employment action because of it.

Though the timing certainly seems unfortunate from Plaintiff's perspective, it cannot be said to be "unduly suggestive."  Unlike Lichentstein, there is no dispute over when the decision to terminate Griffith's employment was made—after admitting to Atkinson that she had engaged in force balancing—and the fact that Plaintiff did take FMLA leave cannot insulate her from such a decision.  Nor does the timing of the decision suggest that that Plaintiff's FMLA leave was a "negative factor" that hastened her termination, Lichtenstein, 691 F.3d at 311, but instead it appears that her FMLA leave likely prolonged PNC's decision.  Even when viewing the record and the undisputed facts most favorably for Plaintiff, the Court does not find that a reasonable

juror could question PNC's proffered reason for Griffith's termination based on the timing of the relevant events.

### b.      Plaintiff's "Honest Error"

Plaintiff argues that she should not have been terminated because she made an "honest error," and did not <u>intentionally</u> engage in force balancing.  (Pl.'s Opp'n at 10-11.)  She further argues that PNC's force balancing policy, which prohibits "manipulating a teller's cash figures to force the cashbox into balance," requires intentional conduct.  (<u>Id.</u> at 10.)  Yet, Plaintiff cites no authority for her own interpretation of PNC's force balancing policy, and ignores the record evidence regarding PNC's interpretation of its force balancing policy, including her own admissions.[16]  In short, she does not deny that she engaged in an act that PNC considered force balancing, but only takes issue with whether PNC <u>should</u> have considered such an act a terminable offense.

It is not enough that Plaintiff show that the employer's business decision was wrong or mistaken.  <u>See</u> <u>Fuentes</u>, 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); <u>see also</u> <u>Davis v. Supervalu, Inc.</u>, Civ. No. 13-414, 2014 WL 5320171, at *8 (D.N.J. Oct. 16, 2014) (noting that to establish pretext it was not enough to show that the plaintiff merely made a mistake or that the defendants erroneously concluded that the plaintiff intentionally allowed a customer to leave without

---

[16] Moreover, the Court will not quibble over the intentionality requirement and how PNC interprets its force balancing policy.  <u>See</u> <u>Frank v. PNC Fin. Servs. Grp., Inc.</u>, Civ. No. 12-34, 2013 WL 4432857, at *8 (W.D. Pa. Aug. 15, 2013) (rejecting the plaintiff's attempt to second-guess how PNC defines "force balancing" and stating that "[i]t is not for the Court to sit as a super human resources department and reexamine PNC's business decisions.") (citing <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 332 (3d Cir. 1995) (refusing to "sit as a super-personnel department that reexamines an entity's business decisions."))

paying) (citing <u>Fuentes</u>, 32 F.3d at 765). She must instead offer evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' proffered reason that a reasonable fact-finder could rationally find it unworthy of belief. <u>Id.</u> Plaintiff has failed to do that on this issue.

PNC considers force balancing, regardless of the intentionality of the act, to be an act of dishonesty that may result in termination of employment. According to PNC's evidence, which Plaintiff offers nothing to contradict, it does not ask whether an employee "intended" to force balance. Under PNC's policy, Griffith admitted that she engaged in force balancing by acknowledging that she did not re-count the vault after initiating but failing to complete the buy/sell transaction, and showing her vault as balanced at the end of her shift when in fact it was $5000 short. Plaintiff may claim an honest mistake was made, but the Court is not here to second-guess the prudence of PNC's business decision to discharge employees who engage in "accidental" force balancing. <u>Fuentes</u>, 32 F.3d at 765; <u>see also</u> <u>Jones v. CVS Pharmacy</u>, Civ. No. 07-3878, 2008 WL 5416301, at *7-8 (D.N.J. Dec. 22, 2008) (rejecting employee's subjective beliefs as to the significance of her misconduct, and judgment as to the importance of her employer's policies and criteria, as irrelevant).

Accordingly, the Court does not find that a jury could reasonably find PNC's interpretation of its force balancing policy was so unreasonable or incoherently applied as to make PNC's justification for terminating Plaintiff pretextual.

### c.    Shah's Treatment of Plaintiff

Plaintiff also claims that Shah's treatment of Plaintiff, and other PNC employees, demonstrated his animus towards those that would take medical leaves of absence. (Pl.'s Opp'n at 11-12.) However, even viewing the admissible evidence in the record most favorably for

Plaintiff, the Court cannot say that she has demonstrated Shah's words or actions cast such doubt on PNC's proffered reason for Griffith's termination that a reasonable factfinder could find its reason "unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765.

Based on the stipulated facts and the evidence in the record, Shah's allegedly discriminatory behavior amounted to: (1) mentioning to Plaintiff that the branch was short staffed when Plaintiff took non-FMLA leave prior to her having ever applied for FMLA leave, (2) giving Plaintiff an employee rating of "marginally achieves" after she began taking intermittent FMLA leave, (3) telling another PNC employee that she could not have time off work because Griffith needed to take her son to the hospital, (4) offering Griffith the opportunity to work on weekends as an accommodation so that she could make personal calls during the week on her own time, (5) suggesting that Griffith might use paid vacation instead of unpaid medical leave, (6) contacting ERIC with questions about whether Griffith could use paid vacation instead of medical leave, and whether she should be out driving in public while she was on FMLA leave.  Plaintiff cites other alleged actions undertaken by Shah which supposedly demonstrate his animus, but as noted above, the materials that support these allegations are not part of the record.

First, the Court is unpersuaded by any comments Shah may have made prior to Plaintiff's first request for FMLA leave, as it is unclear why such comments suggest animus towards Plaintiff's decision to request FMLA leave.  Second, it is true that Plaintiff's 2010 performance appraisal mentioned she had not communicated with fellow employees regarding her regular absences for FMLA leave and that she had been offered weekend hours in order to provide her with time off during the week to make personal phone calls.  However, it is unclear why such a comment in the ""Employee Satisfaction – self & team members" section of her appraisal is

evidence of animus, particularly where Plaintiff does not deny that other employees had complained to Shah about phone calls she had been making during work hours.  Plaintiff takes issue with her overall rating of "marginally achieves," despite receiving more "achieves" in the eight discrete sections of her performance appraisal.  The 2010 appraisal makes clear that Plaintiff had 42 occurrences of teller differences, failed to engage in structured coaching with her team members as she had been asked, and failed to communicate her frequent absences to her coworkers adequately.  While Shah was eventually asked to remove the reference to Griffith's time spent tending to family and medical needs, the revised appraisal makes clear that she still needed to do a better job of limiting the number of personal calls made during work hours and prioritizing business needs over personal needs.[17]  On its face, the Court cannot find that such an appraisal is suggestive of any animus towards Griffith for taking FMLA leave.

Shah's offer to Griffith that she might work on weekends in order to give her time off during the week to make personal calls to doctors would only appear malicious to the most cynical of individuals, and could not cause a reasonable juror to doubt PNC's reason for terminating Plaintiff's employment.[18]  Nor would Shah's inquiry to Griffith and ERIC concerning whether she could or would use her paid leave in lieu of unpaid FMLA leave.[19]  The record reflects that Shah was aware that the unpaid leave created a financial burden for Griffith, and his motivation was at least in part to find a solution for such a burden.

---

[17] Further, the record does not suggest that Griffith's complaint about the language in her appraisal was related to her FMLA leave, only that she objected to having any reference to her family or medical concerns in her appraisal.

[18] There is no evidence on the record that Shah attempted to force Griffith to work on weekends, and Griffith's own testimony belies such a claim.

[19] The Court also notes that a company policy requiring an employee to substitute accrued paid leave for unpaid FMLA leave is consistent with the FMLA.  See 29 C.F.R. § 825.207(a).

The question to ERIC about whether Griffith should be out of her home driving while on FMLA leave perhaps suggests that Shah did not approve of <u>what</u> Griffith was doing while on FMLA leave, but there is no evidence from the record that this call to ERIC on April 24, 2011, resulted in any negative treatment for Plaintiff with regard to her ongoing intermittent FMLA leave and future FMLA leave.

The only action taken by Shah that might be indicative of his animosity towards Griffith for taking FMLA is the instance where he told another employee she could not have time off because Griffith had to take her son to the hospital.  Such a comment could cut either way, and certainly appears to have demonstrated a lack of tact, but the Court is unable to find that this de minimis event is sufficient to establish Shah's animus towards Plaintiff's FMLA leave such that it would call into question PNC's proffered reason for her termination in August 2011.

This conclusion is supported by the fact that the record is replete with evidence demonstrating that Plaintiff asked for and was granted all of FMLA leave time she requested. None of the comments or actions made by Shah, or other PNC employees, appear to be aimed at Griffith's decision to request or use her FMLA leave, but rather appear to take issue with the way in which Griffith failed to communicate how her availability would be affected.  Plaintiff cites no case law suggesting that an employee's right to take FMLA comes with it a coextensive right to use work time for personal matters and to never have one's leave time brought up with other employees.

What this Court is concerned with is whether Plaintiff has shown that Defendants' reason for terminating Griffith—her act of force balancing—is so inconsistent or incongruous with the evidence in the record that a reasonable juror could conclude that it is to be disbelieved.  With regard to Shah's words and actions, the Court finds them to be at worst de minimis or

22

ambiguous, and these could not cause a reasonable juror to doubt PNC's motive for firing Plaintiff.

### d.    Shah's Violation of PNC Policy

To establish pretext, Plaintiff may offer admissible evidence and identify similarly-situated employees who engaged in similar conduct and who were treated more favorably.  See Opsatnik v. Norfolk Southern Corp., 335 Fed. App'x 220, 223 (3d Cir. 2009) (noting that relevant factors used to determine whether another employee is similarly-situated often include "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them") (internal quotation marks omitted) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

Plaintiff admits that she has no evidence of any other employee who engaged in force balancing and who was not terminated by PNC,[20] and she does not dispute that PNC has terminated over thirty employees, including Griffith, between 2010 and 2012.  Instead, Plaintiff seeks to rely on the fact that Shah was not terminated after he allegedly requested that another employee notarize his wife's signature outside of her presence, in violation of PNC policy.

Plaintiff has selectively chosen Shah as a comparator, despite the fact he was not similarly-situated, and ignored other possible comparators more similarly-situated to Plaintiff. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645-47 (3d Cir. 1998) (noting

---

[20] Plaintiff claims that her act of force balancing was an "honest mistake," and one "that anyone could have and probably has committed."  (Pl.'s Opp'n at 10-11.)  Though it is not clear from her opposition papers, it is unclear whether this statement was meant to indicate that other employees had "probably" force balanced and were not terminated.  To the extent Plaintiff is attempting to make such an argument, the Court only notes that there is no evidence in the record to support such speculation.

that a plaintiff cannot "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she").  Aside from the fact that there is no evidence in the record that Shah's conduct was even investigated or made the subject of a possible adverse employment action, the Court notes that Shah is also not a similarly-situated comparator in several respects.  Shah's alleged malfeasance was of a wholly different nature than Griffith's.  While his conduct may have violated PNC's Bonding Policy, it did not involve handling money or force balancing.  There is also no evidence that Shah also had been placed on probation or received prior warnings for failure to follow PNC policies, as Griffith had received regarding her teller differences in the year preceding her termination for force balancing.  The record is devoid of any mention of Shah requesting or being denied FMLA leave.  Nor was Shah was in the same position as Plaintiff.  He was the Branch Manager at Absecon, and was Griffith's supervisor or superior at all relevant times.

Because there is a better class of would-be comparators, such as employees with a similar position or role as Plaintiff's who faced adverse employment action for force balancing, the Court finds Plaintiff's reliance on the incident with Shah misplaced.  Shah's treatment says nothing about how PNC dealt with other allegations of force balancing, particularly with employees who had requested or taken FMLA leave.  There is no evidence on the record that Plaintiff was treated differently than similarly-situated employees, and a reasonable juror could not find otherwise.

For the foregoing reasons, the Court rejects Plaintiff's arguments that the record reflects any evidence of pretext on Defendants' behalf.  The various factors cited by Plaintiff, taken in whole or individually, do not show weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in PNC's proffered reason such that a reasonable fact find could rationally find
it "unworthy of credence."   Fuentes, 32 F.3d at 765.  Accordingly, the Court will grant
Defendants' Motion for Summary Judgment as to Plaintiff's retaliation claims against PNC and
Shah.

### B.      FMLA Interference Claim

To state a claim for interference under the FMLA, Plaintiff must establish: (1) she was an
eligible employee under the FMLA; (2) PNC was an employer subject to the FMLA's
requirements; (3) Griffith was entitled to FMLA leave; (4) Griffith gave notice to Defendants of
her intention to take FMLA leave; and (5) Griffith was denied benefits to which she was entitled
under the FMLA.  Ross, 755 F.3d at 191-92.  An interference claim under the FMLA "is not
about discrimination, it is only about whether the employer provided the employee with the
entitlements guaranteed by the FMLA."  Sommer v. The Vanguard Grp., 461 F.3d 397, 400 (3d
Cir. 2006).  Therefore, the McDonnell Douglas burden shifting framework is not required.  Id. at
399.

An employer may also interfere with the exercise of FMLA rights by "discouraging an
employee from using such leave," 29 C.F.R. § 825.220(b), which requires showing actual
discouragement.  See e.g., Shtab v. Greate Bay Hotel and Casino, Inc., 173 F. Supp. 2d 255,
267–68 (D.N.J. 2001) (employee was asked to delay FMLA leave); Williams v. Shenango, Inc.,
986 F. Supp. 309, 320–21 (W.D. Pa. 1997) (employee was asked to reschedule FMLA leave);
Sabbrese v. Lowe's Home Centers, Inc., 320 F. Supp. 2d 311, 330 (W.D. Pa. 2004) (employee
was "actually penalized for exercising his right to take [FMLA leave]" via a performance
warning in a disciplinary meeting).  The essential elements of a discouragement claim would
require Plaintiff to show that "(1) she was entitled to take FMLA leave, (2) her employer

interfered with her right to do so, and (3) she suffered prejudice because she would have requested and received FMLA leave but for her employer's discouragement." Wright v. Shore Mem'l Hosp., Civ. No. 11-5583, 2013 WL 6080072, at *8 (D.N.J. Nov. 19, 2013) (citing Brock–Chapman v. Nat'l Care Network, LLC, Civ. No. 10–454, 2013 WL 169177, at *7-8 (N.D. Tex. Jan. 16, 2013) (denying summary judgment when an employee claimed her employer discouraged her from taking intermittent leave and instead forced her to take paid time off, stating there was a genuine issue of fact as to whether the arrangement harmed her financially)). For instance, where an employer's actions would "chill" or "inhibit" an employee from exercising his or her FMLA rights, a claim for interference may arise.  See Bravo v. Union Cnty., Civ. No. 12-2848, 2013 WL 2285780, at *9 (D.N.J. May 23, 2013) (denying a motion for summary judgment because a reasonably jury could find that an employer's statements and conduct "would inhibit her from exercising FMLA rights in the future" and a jury could find prejudice because the defendant delayed providing FMLA paperwork and forced plaintiff to suffer a two-week delay in receiving treatment).  However, if Plaintiff seeks to show interference by way of Defendants' discouragement, she must show not only that a violation occurred, but that she suffered prejudice thereby.  Wright, 2013 WL 6080072, at *8 (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).

Plaintiff's interference claim fails because there is no evidence that Defendants ever denied her any leave that she requested or was eligible for.  Moore v. U.S. Foodservice, Inc., Civ. No. 11-2460, 2013 WL 5476405, at *8 (D.N.J. Sept. 30, 2013) (recognizing that "if Plaintiff was not denied FMLA leave to which he was entitled, summary judgment must be granted in favor of the defense on Plaintiff's claim of interference.")  There is no evidence here that Griffith

26

did not receive all of the benefit to which she was entitled under the FMLA, including for her son's medical condition or her own medical condition.

To the extent Plaintiff also claims that she was discouraged from taking FMLA leave, the Court finds that there is insufficient evidence on the record to support Plaintiff's claim.  While some of Shah's actions could be considered to be discouragement by a reasonable juror, see Hilborn v. Cordaro, Civ. No. 06-223, 2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (noting that discouragement could include pressuring the employee to take leave at another time, proposing the employee work from home instead of taking FMLA leave, or criticizing the employee for taking too much FMLA leave) (citing Williams, 986 F. Supp. at 320-21; Butler v. IntraCare Hosp. N., Civ. No. 05-2854, 2006 WL 2868942, at *4 (N.D. Tex. Oct. 4, 2006); Grosso v. Fed. Express Corp., 467 F. Supp. 2d 449, 464 (E.D. Pa. 2006)), there is no indication that Plaintiff was prejudiced by any of Shah's behavior.  Griffith has produced no evidence that she was chilled from requesting further FMLA leave that she would have been entitled to, and the record reflects that all of the leave she was entitled to was granted.  See Wright, 2013 WL 6080072, at *10 (finding that, while a jury could reasonably infer that the defendants discouraged the plaintiff from requesting intermittent FMLA leave, Plaintiff had failed to produce any evidence of prejudice because she had failed to show that she would have been entitled to additional leave that she did not obtain due to the defendants' discouragement).

In sum, the evidence does not suggest that Griffith was ever denied leave that she requested or to which she was entitled, and there is no evidence than any of Defendants' actions which may have been discouraging ever actually prejudiced Griffith.  Based on the record, a jury could not reasonably find that Defendants interfered with Plaintiff's rights in

27

violation of the FMLA, and the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's interference claims against PNC and Shah.

**II.     CONCLUSION**

For the reasons expressed above, Defendants' Motion for Summary Judgment will be **GRANTED**.  An appropriate Order shall enter.

Dated:  5/20/2015                 s/ Robert B. Kugler
                              ROBERT B. KUGLER
                              United States District Judge